Tanenbaum, J.
(dissenting and voting to reverse the judg-
ment of conviction and dismiss the accusatory instrument). At the Town of Fishkill Town Board meeting, which was open to the public, defendant Albra was recognized to speak. At the very beginning of defendant’s question, Town Supervisor Pagones stated, “no, the lies are not going to continue,” and later stated, “the Pagones family, of all families, are used to dealing with big time liars. [You] are in the little bit into the small time lying routine. I will tell you this.” Thereafter, defendant’s questions precipitated a tongue lashing by Supervisor Pagones and hostile comments by Councilman Zack, who asserted that defendant made false statements at a prior meeting. He was directed to leave the meeting but refused citing his “[F]irst [A]mendment rights.” The supervisor then directed his removal. He again declined stating, “I am going to have to be arrested then.” He was arrested and charged with disorderly conduct in violation of Penal Law § 240.20 (4) and trespass in violation of Penal Law § 140.05.
This is a transcript of the minutes of the meeting:
“Motion made by Councilman Zack to go into privilege of the floor for agenda items.
“Seconded by Councilman Ferguson
“All Ayes
“Motion carried
“Azem Albra asked about the aquifer, it appears that the Toll Brothers is building houses right on top of the aquifer, can you confirm or deny that?
“Supervisor Pagones asked if Town Engineer, John Andrews wanted to handle this on truth here?
“Azem Albra stated that is what he is asking.
“Supervisor Pagones stated no, the lies are not going to continue. John, do you want to address this for the public?
“Town Engineer, John Andrews, answered, point in fact Toll Brothers was and originally reviewed way back when it was Merritt Park Realty Development, the extent of that aquifer was well studied, the design of that project has incorporated all the necessary features into it, and was actually a significant study which exists in the environmental documents, and what we see today is consistent with the recommendations that were made for that development in that area.
*68 “The extent of the aquifer in that area is slightly different than other areas, it is relatively shallow, there are a few other issues related to it, they all have been incorporated into the design of the project as we see it today. Nothing that is being done is inconsistent with the protection that needs to be in place for that.
“Supervisor Pagones asked if there were any other questions.
“Azem Albra stated that his question is, is it being built on top of the aquifer, yes or no? It is a simple question.
“Town Attorney, Ronald Blass, advised the Supervisor that she did not have to answer that question.
“Supervisor Pagones replied to Mr. Albra by saying, the Pagones family, of all families, are used to dealing with big time liars. [You] are in the little bit into the small time lying routine. I will tell you this,
“Azem Albra: you are slandering a public officer.
“Supervisor Pagones: No, you are lying.
“Azem Albra: You are calling me a liar, you cannot call me a liar without evidence. Where is your evidence? You have no evidence.
“Councilman Zack: The July 7th meeting, you made a false misleading statement. You have no evidence to back it up.
“Supervisor Pagones: That is correct, that is a lie. You have lied repeatedly to this board. It will not be continued, we will go head to head with you.
“Azem Albra: Lied to court?
“Councilman Zack: She said Board, not court.
“Supervisor Pagones: Yes, this Board. We are not going to consider your comments. One more outburst, and Officer Hurley will have you out of here. What other questions do you have?
“Azem Albra: On the map, the guy over here of the Waterfront with the water access, I noticed there were 92 homes, 92 slips for the people that live there, I don’t see any storage areas for those boats, I don’t know if you are aware of that or not, where are they going to put those boats, in the driveways or are they going to have separate space?
“Councilman Zack: This is not the forum to bring that up, that is a Planning Board meeting.
*69 “Azem Albra: Okay, one last question, Mr. Walsh and the Town Board seems to think that in raising assessments is not a tax hike, correct?
“Supervisor Pagones: That is correct.
“Azem Albra: Mr. Walsh today,
“Supervisor Pagones: It is not Mr. Walsh, it is Mr. Watch.
“Azem Albra: Mr. Watch said that after he is done with the assessment, only 10% will pay more taxes.
“Supervisor Pagones: Maybe, yes.
“Azem Albra: More taxes.
“Supervisor Pagones: No, obviously you don’t understand how it works. I have said before, we are not going to be giving you Government 101. Here is how it works for the purposes of everyone who is here today. Maybe you are not paying what you should be paying on your house being assessed. Here is the tax rate, if your house is assessed more than what it was in 04 or 03, yes, some may be paying more. But that means their houses were not, they were not paying the full value to begin with. There are many people out there that the houses are assessed that are brand new that are paying more than somebody that may have been there for thirty years and they have a lower assessment. Things have changed, our equalization rate is down to 52% and this results in higher school taxes being paid by town residents, higher county taxes. When the county passes the budget that has a 5% increase, it may result in a 15% rate increase. Something has to be done to the revalue to make sure everyone is paying their fair share. If you fall into that after the revalue, you fall into it. We are not going to change the budget. We are going to continue to try to lower taxes. In the Town of Northeast, this worked out where everyone got a tax decrease because of the revalue. It is the way revalues work. Any other questions?
“Azem Albra: Yes, on March 17th you stated that you and the entire Town Board hired Mr. Bernstein, on March 18th
“Supervisor Pagones: This is not an agenda item, Mr. Hurley, out, that is it. We will not be disrupted, please remove.
*70 “Azem Albra: You cannot throw me out.
“Supervisor Pagones: Oh yes we are.
“Azem Albra: You are not throwing me out, my first amendment rights is
“Supervisor Pagones: This Town will not be turned into a circus. You should have been arrested on the evening that that incident came up. You are leaving please.
“Azem Albra: I am not leaving.
“Supervisor Pagones: Well, I guess we have [a] problem.
“Azem Albra: You will have to arrest me.
“Officer Hurley: You were asked to leave.
“Azem Albra: No, I have my first amendment rights as a citizen, you called me a liar, and I have the proof to say that you are a liar. I have the proof.
“Supervisor Pagones: No, I would like him removed from the building.
“Azem Albra: I am going to have to be arrested then.
“Officer Hurley: You are under arrest.
“Azem Albra: Okay, I am going.
“Councilman Zack: This goes back to the July 7th meeting.
“Azem Albra: You cannot do this.
“Supervisor Pagones: My apologies to those individuals here today but we will not continue to have disruption of the Town’s business. It will not occur on my watch.
“Councilman Zack: This individual has used this forum to make false misleading statements against the Supervisor and this Board for sole purposes to upset this Board.
“Supervisor Pagones: Is there anyone else who wishes to speak?
“The board went into executive session for 33 minutes then returned to regular session and immediately adjourned without further business or proceedings.”
A person is guilty of disorderly conduct under Penal Law § 240.20 (4) when “with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . *71 [wjithout lawful authority, he disturbs any lawful assembly or meeting of persons.”
A person is guilty of trespass when “he knowingly enters or remains unlawfully in or upon premises” (Penal Law § 140.05).
“When the [premises] is ‘open to the public’ at the time of the alleged trespass . . . the accused is presumed to have a license and privilege to be present. ... In such a case, the People have the burden of proving that a lawful order excluding the defendant from the premises issued, that the order was communicated to the defendant by a person with authority to make the order, and that the defendant defied that order” (People v Leonard, 62 NY2d 404, 408 [1984] [citations omitted]).
Furthermore, the People must demonstrate that the order excluding the defendant from the premises “had a legitimate basis and that, considering the nature and use of the subject property, its enforcement did not unlawfully inhibit or circumscribe the defendant from engaging in constitutionally or statutorily protected conduct” (id. at 411).
When the public enjoys broad license to utilize certain property, state trespass laws may not be enforced solely to exclude persons from exercising First Amendment or other protected conduct in a manner consistent with the use of the property (Food Employees v Logan Valley Plaza, Inc., 391 US 308, 319-320 [1968]; Marsh v Alabama, 326 US 501 [1946]; compare PruneYard Shopping Center v Robins, 447 US 74 [1980]). Therefore, a decision to exclude which impermissibly inhibits persons from exercising a constitutionally or a statutorily protected activity will not be lawful (see People v Munafo, 50 NY2d 326 [1980]).
In my opinion, the People have failed to sustain their burden of proof beyond a reasonable doubt as to both charges since the defendant was engaging in a constitutionally protected activity.
The power of petition and the exercise of free speech may, by their nature, “annoy” or “inconvenience” those whose views are being challenged. Under the facts presented, defendant’s conduct does not support the criminal charges of disorderly conduct and criminal trespass. The court below has created a new criminal standard for punishment of irrelevant or stupid questions posed at a government meeting. The general imposition of this standard would chill public discourse and empty government meetings and courthouses. Our United States and *72 New York constitutions were designed to prevent this result. “The fact that certain modes of expression may be ‘annoying’ to others does not require an individual to forfeit his right under the 1st Amendment to make those expressions” (People v Dupont, 107 AD2d 247, 255-256 [1985]).
Moreover, this annoyance does not authorize those in control of public meetings to abandon restraint, unleash a stream of invective and cause the target to be arrested. This is because disagreement with orthodox views, or annoyance or vexation of the Town Board does not by itself translate into criminal conduct (id. at 253). Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal First Amendment protections against general restrictions and ad hoc parliamentary rulings by presiding officials. “[T]he participation in public discussion of public business cannot be confined to one category of interested individuals. To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees” (Madison Joint School Dist. No. 8 v Wisconsin Employment Relations Comm’n, 429 US 167, 175-176 [1976]; see Collinson v Gott, 895 F2d 994, 1000 [4th Cir 1990]; Monteiro v City of Elizabeth, 436 F3d 397, 404 [3d Cir 2006]).
The primacy of individual speech rights starts with the limitation on governmental action caused by the effect of the “prohibition of the Constitution, such as those of the first ten Amendments” (United States v Carolene Products Co., 304 US 144, 152 n 4 [1938]).
In Musso v Hourigan (836 F2d 736, 742 [2d Cir 1988]), in reviewing the power of government boards to regulate speech in an open forum, the court found:
“As a general rule, the [F]irst [A]mendment prohibits state action that regulates speech on the basis of content. Police Dep’t v. Mosley, 408 U.S. 92, 95-96 (1972), and the conduct of school board officials clearly constitutes ‘state action’ for [F]irst [A]mendment purposes. See, e.g., Board of Educ. v. Pico, 457 U.S. 853, 877-78 (1982) (Blackmun, J., concurring). Moreover, even though the government may subject speech to valid time, place and manner restrictions, such regulation is particularly circumscribed when the speech occurs in a place where public speech is usually allowed, such as an open school board meet *73 ing. Cf. Board of Airport Comm’rs v. Jews for Jesus, Inc., 482 U.S. 569 (1987); New York City Unemployed and Welfare Council v. Brezenoff, 677 F.2d 232, 237 (2d Cir. 1982). In addition, and of great significance for purposes of the present litigation, such regulation must be content-neutral. Heffron v. International Soc’y for Krishna Consciousness, 452 US 640, 647-48 (1981).”
Different rules may apply at a limited forum (Good News Club v Milford Central School, 533 US 98, 107 [2001]) or where the speaker was antagonistic (Jones v Heyman, 888 F2d 1328 [11th Cir 1989]; see also Eichenlaub v Township of Indiana, 385 F3d 274, 279-280 [3d Cir 2004]).
The First Amendment protection of the United States Constitution is in addition to the protection provided in New York State Constitution article I. The state protection “is often broader than the minimum required by the First Amendment” (O’Neill v Oakgrove Constr., 71 NY2d 521, 529 n 3 [1988]; see also Time Sq. Books v City of Rochester, 223 AD2d 270 [1996]; SHAD Alliance v Smith Haven Mall, 106 AD2d 189, 199 [1985]).
Article I, §§ 8 and 9 (1) of the New York State Constitution provide in pertinent part:
“§ 8 Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”
“§ 9 . . . 1. No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof.”
Article 7 of the Public Officers Law provides:
“§ 100. Legislative declaration
“It is essential to the maintenance of a democratic society that the public business be performed in an open and public manner and that the citizens of this state be fully aware of and able to observe the performance of public officials and attend and listen to the deliberations and decisions that go into the making of public policy.”
There are two rights implicated in the events. The right to address the Town Board meeting and the right to be present at the meeting. Asking an irrelevant question does not result in the forfeiture of the right to be present.
The hostility at the meeting was created and exacerbated by the supervisor. In this case the remedy was to end the confronta *74 tion by not inviting further questions. Even if the supervisor subjectively concluded, or by post hoc analysis we find the content irrelevant to the topic under discussion the remedy was to stop new questions, recognize a new speaker or take a recess as the board did here. The record shows that there were no other speakers and that the meeting was terminated. There are two fact patterns in the underlying cases: (1) intrusion without authority, and (2) punishment for speech content of one with authority to be present and speak. Here defendant was punished because the content of his speech was deemed “irrelevant.” He had been recognized and authorized as a speaker, and defendant was asked: “Any other questions?” He responded: “Yes, on March 17th you stated that you and the entire Town Board hired Mr. Bernstein, on March 18.” “Supervisor Pagones: This is not an agenda item, Mr. Hurley, out, that is it. We will not be disrupted, please remove.”
This is unlike those cases where a speaker not authorized to speak injected himself and disrupted the meeting. The supervisor exceeded her power by censoring the content of the defendant’s speech by punishing the speaker — ordering that he be ejected from the meeting — not for any unlawful action on his part but because the content of his speech was not satisfactory to the supervisor. The royal prerogative of banishment is not vested in the Town Board supervisor as the vehicle to terminate speech. Although the supervisor might have ended defendant Albra’s time as a speaker, under the provisions of the First Amendment of the United States Constitution and New York Constitution, article I, §§ 8 and 9 and the provisions of article 7 of the Public Officers Law, the Open Meetings Law, the defendant had an absolute right to remain as an observer of the balance of the Town Board meeting.
Thus, an examination of the events results in the conclusion that the defendant was engaging in activities protected by the United States and New York State constitutions and the Open Meetings Law. The direction that he be expelled and his subsequent arrest were unwarranted.
For the foregoing reasons, I would reverse the judgment of conviction.
Rudolph, BJ., and Angiolillo, J., concur; Tanenbaum, J., dissents in a separate memorandum.